## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JEFFREY WILLNERD, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **8:05CV482** |
| **vs.** | ) | |
| | ) | **MEMORANDUM AND** |
| FIRST NATIONAL OF NEBRASKA, INC., | ) | **ORDER** |
| | ) | |
| **Defendant.** | ) | |

This matter is before the court pursuant to 28 U.S.C. § 636 and the consent of the parties on defendant's Motion for Summary Judgment [60]. Defendant's reply brief[1] was filed on September 13, 2007, at which time the motion was deemed submitted. The court has carefully reviewed the pleadings, the briefs, and the evidentiary materials filed by the parties. For the reasons explained below, the court finds and concludes that the motion for summary judgment should be granted.

## I.  INTRODUCTION[2]

In August 1982, plaintiff began employment with the defendant ("First National"), where he worked as a Loan Officer/Sales Representative at the Beatrice branch facility. In 1998, plaintiff noticed that his voice was becoming hypernasal in sound. In December 1999, he began seeking medical treatment for the problem; however, his condition continued to deteriorate.

---

[1]Plaintiff's Objection [85] to the reply brief on the ground that a reply brief is not authorized under NECivR 56.1 is overruled. Local Rule 56.1 clearly provides: "Except as otherwise provided in this rule, the procedures of Nebraska Civil Rule 7.1 apply to motions for summary judgment." Defendant's reply brief was authorized by NECivR 7.1(c) and was timely filed under Fed. R. Civ. P. 6(a).

[2]The information in this introductory section was derived from factual allegations admitted in the pleadings.

In June 2002, management for First National announced that the position of Assistant Manager at the Beatrice branch was being eliminated and the person occupying that position would be trained as a Sales Representative and would perform work similar to plaintiff's work.

In January 2003, plaintiff's annual review noted that he met expectations in all categories except sales areas. He was encouraged to make more outside calls on car dealers and small businesses. Plaintiff was given a pay raise after the January 2003 evaluation. During the last five quarters of plaintiff's employment, he met four out of five sales expectation quotas, but did not meet his loan volume quota, which constituted a major component of his job. On May 6, 2003, plaintiff had a meeting with bank management during which he was told that First National was cutting expenses and considering the elimination of his position and other positions within the bank. Plaintiff was told that his performance would be evaluated at the end of the next quarter.

Plaintiff's sales volume increased between May and September 2003 and he inquired about additional training during that period. On September 30, 2003, however, plaintiff was advised by management that his job at the Beatrice branch was being eliminated, he would become part of the bank's redeployment process, and he could have access to both internal and external job openings at First National. Plaintiff made numerous attempts to apply for a variety of internal job openings at First National, but was not hired for any of those positions.

In March 2004, plaintiff received notice that he was accepted to receive long term disability ("LTD") benefits under First National's policy with Mutual of Omaha, dating back to November 6, 2003. Upon receiving LTD benefits, plaintiff ceased being an active employee of First National.

Plaintiff filed claims of discrimination with the Nebraska Equal Opportunity Commission (NEOC) and the Equal Employment Opportunity Commission (EEOC). He received a Notice of

Right to Sue from the EEOC on July 6, 2005 and filed this action in Nebraska state court on September 26, 2005, asserting a claim for disability discrimination under the Americans with Disabilities Act, 42 U.S.C. §§12101-12213 ("ADA").  The matter was timely removed to federal court.

Specifically, the complaint alleges First National unlawfully discriminated against plaintiff on the basis of his disability, or on the basis of his perceived disability, (1) by terminating his employment at First National and (2) by placing plaintiff on LTD instead of providing him reasonable accommodations.  First National denies these allegations.

## II.  FINDINGS OF FACT

The court finds that the following facts are uncontroverted for purposes of this Motion for Summary Judgment and constitute the material facts upon which a resolution of these issues must be premised.

### A.  Plaintiff

Plaintiff, a Nebraska resident, was first hired by First Security Savings on August 24, 1982, and performed the functions of loan officer/sales representative.  Defendant ("First National") purchased First Security Savings in early 1983.  Plaintiff was, at all times pertinent to this action, employed by First National at its branch facility in Beatrice, Nebraska. From 1999 until 2001, plaintiff was also a representative for Investment One, a subsidiary of First National that sold non-branch-related investment products. Plaintiff stopped working as an Investment One representative when First National required a full-time person for Investment One, and plaintiff did not want to give up his lending duties with the bank.  Plaintiff and another employee, James Spangler, were both assigned to the position of "Consumer Bank Sales Representative" in May 2002.

When his job position was eliminated in 2003 and he was redeployed, plaintiff's position was that of Consumer Bank Sales Representative at defendant's Beatrice branch

In 1999, plaintiff began having problems with his voice.  His condition gradually worsened to the point that he can no longer speak in a normal tone of voice for any extended period of time. In November 2003, he sought treatment at the Mayo Clinic and was initially diagnosed as having hyperkinetic dysarthria (neck/laryngeal/palatal dystonia), a condition thought to be neurologic in origin.  His condition was later described at the Mayo Clinic as "abductor spasmodic dysphonia, dystonic."  Plaintiff has been receiving Botox injections at the Mayo Clinic every three months since November 2003 to alleviate his symptoms.  In October 2004, plaintiff underwent a bilateral type I thyroplasty with removal of posterior windows in an attempt to help restore his voice.

### B.  Defendant's Employees

James Spangler ("Spangler") was the Assistant Branch Manager of defendant's Beatrice branch from 1996 to 2002 and was a Consumer Bank Sales Representative at the same location beginning in 2002.

Tamara Weers ("Weers") was the mortgage loan officer of defendant's Beatrice branch from at least 1996 until 2002 and the Consumer Bank Lending Representative beginning in 2002.  Upon assuming her role as Consumer Bank Lending Representative, Weers worked in Beatrice but reported directly to the Mortgage Lending Department located in Omaha.

Larry Keslar ("Keslar") was, at most times relevant to this litigation, the Branch President of the Beatrice branch and was plaintiff's supervisor at all times relevant to this litigation. Keslar completed plaintiff's performance evaluations in 1997, 1998, 1999, and 2003.

-4-

Gale Lueth ("Lueth") was, at all times relevant to this litigation, a specialist in commercial and agricultural loans at defendant's bank branch in Beatrice until 2002 and was plaintiff's supervisor from 2000 to 2002.  Lueth completed plaintiff's performance evaluations in 2000, 2001, and 2002.

Teresa Faxon ("Faxon") was, at all times relevant to this litigation, the Senior Administrative Assistant of defendant's bank branch located in Beatrice, Nebraska.

David Ulferts ("Ulferts") was, at all times relevant to this litigation, defendant's Second Vice President in the Retail Division.

Christopher Kisicki ("Kisicki") was, at all times relevant to this litigation, defendant's Second Vice President, Market Manager, and reported directly to Ulferts.

Kristina Staebell ("Staebell") was the Recruiter for defendant's Bankcard Center, Platinum Recovery Services, First Financial Services, and Enterprise Technical Services divisions in the Employment Center.  Staebell was charged with forwarding resumes received on to the hiring managers for the positions available within these divisions.  Staebell later became defendant's Recruiting Operating Manager and was charged with working with other recruiters who forwarded applicants' resumes received on to the hiring managers for the positions available at the bank.

Mike Foutch ("Foutch") was, at all times relevant to this litigation, employed by defendant as a Vice President of Human Resources.

Thomas Haller ("Haller") was, at all times relevant to this litigation, employed as defendant's Senior Vice President and Director of Retail Banking.  Haller was Ulferts' immediate supervisor.

### C. Reorganization of the Beatrice Branch

In 2002, management perceived that the Beatrice branch was underperforming , due to the bank's view of poor overall economic conditions, a poor economic climate in the Beatrice market,

the lack of new product sales and customers, and poor branch ratios/metrics against other similarly sized branches. Defendant's first objective in remedying the underperformance in Beatrice was to attempt to increase revenue. If this objective was not met, defendant's secondary goal was to reduce expense.

On February 26, 2002, Ulferts and Kisicki made a presentation to Keslar, Spangler, Lueth, Weers and plaintiff regarding specific improvement opportunities. The goal of this presentation was to raise the level of production from all staff, emphasize larger loans, and eventually increase branch efficiencies.

Plaintiff's directive in the February 26, 2002 presentation was to focus on home equity lending and to increase his annual production from $2 million in loans to $4 million.  In February 2002, defendant's expectation of plaintiff, with underwriting eliminated, was to "generate sales for the bank," specifically "more lending activity."

In May 2002, defendant moved Spangler from the position of Assistant Branch Manager to Consumer Bank Sales Representative to generate more sales and to grow deposits and lending relationships because of his contacts and general stature in the Beatrice community; it was also determined that an Assistant Branch Manager was not needed.  At the same time, defendant made Weers, given her background, the Consumer Bank Lending Representative and made mortgage lending one of her primary duties.

Although plaintiff and Spangler had the same job title after May 2002, their actual responsibilities were different.  Spangler was tasked with "support[ing] the deposit base" of the Beatrice branch whereas plaintiff was assigned a primary focus on lending.  As a result of the change

in Spangler's responsibilities, defendant cross-trained plaintiff and Spangler for both deposits and loans.

On May 6, 2003, plaintiff met with Keslar and Ulferts to discuss again the need for plaintiff's increased production and/or a need for plaintiff to be more proactive in his sales efforts. Plaintiff never expressed to Ulferts and Keslar at the May 2003 meeting that the increase in loan volume defendant expected of plaintiff was generally unachievable or unattainable because of plaintiff's voice; his voice was not mentioned at the meeting.

In May 2003, Ulferts and Kisicki placed plaintiff on a 90-day probation.

Over the next few months in 2003, plaintiff's sales efforts increased moderately; however, David Ulferts concluded that the product and customer results of those efforts were meager.

On August 21, 2003, based on their financial analysis of all of defendant's facilities, and considering general economic conditions, Ulferts and Kisicki recommended to Haller that defendant reduce its Beatrice branch sales staff. Haller testified at his deposition that he did not put a lot of credence in the notion that economic factors in Beatrice were poor, or that there was a slow down. He did believe the Beatrice branch was overstaffed and thought that "most companies would have eliminated [plaintiff's] position when he quit doing the credit underwriting three years ago[.]" Instead of eliminating job positions, First National initially tried to grow the Beatrice branch by improving efficiency and trying to get the Beatrice employees to sell more loans.

Several positions at the Beatrice branch were considered for elimination. To help determine which Beatrice branch position defendant would eliminate, defendant evaluated "how the Beatrice branch could maintain its quality of service and still give [First National] the best prospect for future growth given a reduction in one staff position." Defendant decided to keep the position of Branch

Manager occupied by Keslar because the person with that title is "responsible for the production, quality of service, and P & L [profit and loss] responsibilities."  Defendant decided to keep the position of Consumer Bank Sales Representative occupied by Spangler because Spangler was a more effective sales person, enjoyed contacts and stature in the community, and he (at the time) was able to act as Branch Manager in the event that Keslar was no longer with the bank.  Defendant decided to retain the position of Consumer Bank Lending Representative occupied by Weers because the person with that title had "an emphasis on all lending products and [had a] specialized skill set in mortgage lending."  Defendant decided to retain the position of the Personal Bankers because "both bankers [were] primarily responsible for deposit related products and [were] needed to service the $82 million deposits."  Defendant decided to keep the position of Senior Administrative Assistant occupied by Faxon because the person with that title was primarily responsible for handling compliance issues, and Faxon was the best person to perform that job.

Plaintiff's performance evaluations in 1998, 1999, 2000, 2001, and 2002 use a rating system of 0 through 4, with 4 being the highest possible rating.  Plaintiff's performance evaluation for 2003 has four (4) effectiveness levels in the following order: "Exceeds Expectations," "Meets Expectations," "Developing Toward Expectations," and "Unacceptable."

On plaintiff's 1997 performance evaluation, which was completed by Keslar before plaintiff began having voice problems, plaintiff was rated as follows: "Planning/Budgeting/ Innovation," 2/4 since plaintiff "need[s] to be more innovative to increase loan business"; "Business Development/Employee & Customer Relations," 2/4; "Management Skills/Decision Making/ Leadership/ Functional Expertise," 3/4; "Personal Effectiveness/ Time Management/ Self-

Development/Communication," 2/4; "Resource Utilization," 3/4; and "Diversity Development/ Commitment to Affirmative Action," 2/4.

On plaintiff's 1998 performance evaluation, which was completed by Keslar, plaintiff was rated as follows: "Planning/Budgeting/Innovation," 2/4; "Business Development/ Employee & Customer Relations," 2/4; "Management Skills/Decision Making/Leadership/ Functional Expertise," 3/4; "Personal Effectiveness/Time Management/Self-Development/ Communication," 3/4; "Resource Utilization," 2/4; "Diversity Development/Commitment to Affirmative Action," 2/4; and "Noteworthy Performance Since Last Review," 4/4. Although the 1998 performance evaluation states that plaintiff's objective was to make two calls weekly, the evaluation states that plaintiff did not do so.

On plaintiff's 1999 performance evaluation, which was completed by Keslar, plaintiff was rated as follows: "Planning/Budgeting/Innovation," 2/4; "Business Development/ Employee & Customer Relations," 3/4; "Management Skills/Decision Making/Leadership/ Functional Expertise," 3/4; "Personal Effectiveness/Time Management/Self-Development/ Communication," 3/4; "Resource Utilization," 2/4; "Diversity Development/Commitment to Affirmative Action," 3/4; and "Noteworthy Performance Since Last Review," 4/4 for "[b]ecoming an Investment One Rep." The evaluation indicates that plaintiff did not meet his objective to make 12 quality calls per month to existing or prospective customers.

On plaintiff's 2000 performance evaluation, which was completed by Lueth, plaintiff was rated as follows, on a scale of 0/low to 4/high: compiling accurate financial data and determining applicant eligibility, 3.25; determining credit risk and making timely loan decisions, 3; communicating loan decisions to applicants, 3.25; participating in business development and

-9-

marketing programs for consumer loan products, 2.75; discussing Investment One products with applicants, 3.25; participating in business development and marketing programs for Investment One products, 3.25; and other duties and participation in public relations and community events, 2.5.

On plaintiff's 2001 performance evaluation, which was completed by Lueth, Plaintiff was rated as follows, on a scale of 0/low to 4/high: compiling accurate financial data and determining applicant eligibility, 2.5; determining credit risk and making timely loan decisions, 2.5; communicating loan decisions to applicants, 2.5; participating in business development and marketing programs for consumer loan products, 2.25; discussing Investment One products with applicants, 2.25; participating in business development and marketing programs for Investment One products, 2.25; and other duties and participation in public relations and community events, 1/4.

On plaintiff's 2002 performance evaluation, which was completed by Lueth, Plaintiff was rated as follows, on a scale of 0/low to 4/high: compiling accurate financial data and determining applicant eligibility, 2.75; determining credit risk and making timely loan decisions, 2.75; communicating loan decisions to applicants, 2.5; participating in business development and marketing programs for consumer loan products, 2.5; discussing Investment One products with applicants, 2.5; participating in business development and marketing programs for Investment One products, 2.25; completing continue educational requirements for insurance brokers, 2.5; and other duties and participation in public relations and community events, 1.5.

On plaintiff's 2003 performance evaluation, which was completed by Keslar, plaintiff was rated as follows: maintains contact with top branch customers, "Meets Expectations"; partners with other branch staff to foster productive branch culture, "Meets Expectations"; proactively works to achieve personal and branch sales and customer service goals, "Meets Expectations"; sells and cross-

-10-

sells all products and services, "Developing Toward Expectations"; maintains customer-focused service consistent with divisional standards, "Meets Expectations"; and supervises branch in management's absence, "Meets Expectations."

Plaintiff's performance was weak in generating additional business, in persuading customers to use more of defendant's products, and in closing deals. Keslar did not perceive plaintiff to be involved in the community. Ulferts felt that plaintiff was not "proactively maximizing the opportunities with each customer." Management believed that plaintiff's loan performance was "substandard compared to what a loan officer of 27 years' experience should be in the branch." According to Thomas Haller, by 2002, plaintiff's performance in lending did not justify his salary as a lending person. Plaintiff was not generating enough volume to pay for his salary, which was one of the reasons his position was at risk.

Plaintiff's voice issues never came up as a factor to consider in the reduction-in-force conversations Keslar had with Ulferts and Kisicki. Kisicki never had any concern that plaintiff's voice affected his ability to perform as a banker, although he wondered at times how it came across to customers. Kisicki had only known plaintiff during the time frame after plaintiff developed problems with his voice. Kisicki was not based in Beatrice and was at the Beatrice branch, at most, every four to six weeks.

Ulferts did not discuss plaintiff's voice with Keslar or Kisicki as a reason for termination, did not have much contact with the plaintiff, and did not even recall any changes in plaintiff's voice. Plaintiff's voice problems did not factor into the staff reduction in force and the matter "wasn't on the table."

-11-

On September 30, 2003, based upon a review of all Beatrice branch personnel relative to which position would be eliminated, First National, through Ulferts, ultimately decided to eliminate plaintiff's position as Consumer Bank Sales Representative and to "redeploy" him.  Ulferts was the ultimate decision-maker regarding the elimination of plaintiff's position at the Beatrice branch.

Redeployment is a process used by First National to allow an employee who would otherwise be terminated, usually by a reduction in force, to search for other positions within First National, while still on the First National payroll, for a period of time.  In this case, plaintiff's original redeployment period was from September 30, 2003, through November 30, 2003.

Foutch first met plaintiff on September 30, 2003, to discuss the redeployment process with him.  At the redeployment meeting, Foutch did not know that plaintiff was having problems with his voice.  Plaintiff never indicated at the September 30, 2003 meeting that he believed his job elimination/redeployment was due to his voice, nor did anyone mention voice as a reason for plaintiff's redeployment.

If Keslar and Kisicki discussed plaintiff's voice at all, their conversations did not concern how plaintiff's voice problems affected his job but were just out of "concern personally" for plaintiff.  Ulferts did not participate in any of Keslar and Kisicki's few conversations regarding plaintiff's voice.

At the time of his position elimination/redeployment on September 30, 2003, plaintiff's base salary was approximately $42,500.00 per year, plus commissions, bonuses and insurance benefits.

Prior to his redeployment, plaintiff provided no written information to defendant regarding any medical condition that afflicted him or medical documents to support such a claim.  Prior to his redeployment, plaintiff made no accommodation request to defendant. No one employed with defendant has said anything negative to plaintiff about his voice condition.

-12-

First National has never reopened or refilled plaintiff's position as a Consumer Bank Sales Representative. Plaintiff's former responsibilities were assigned to other employees, i.e., to Spangler, Faxon and Weers.

### D.  Redeployment, LTD and Termination

Recruiter Kristina Staebell first met with plaintiff in October 2003 and advised him that it was his duty to seek and apply for positions available with First National and that she would help him. Plaintiff did not submit any applications for employment with defendant until December 24, 2003.

On November 7, 2003, Joseph R. Duffy, Ph.D. ("Dr. Duffy"), a speech pathologist with the Mayo Clinic, electronically signed a clinic document stating that plaintiff's voice "deficits [were] severe enough to preclude his being effective in any job requiring phone work or direct speaking contact with clients." Dr. Duffy wrote that plaintiff had "a problem that would be very significantly disabling for anyone engaged in work requiring speech and interpersonal communication" and that the problem "is sufficiently severe to impact [plaintiff's] ability to communicate effectively in any work setting requiring reasonably normal speech." Dr. Duffy's opinion has not changed since plaintiff had surgery on his vocal cords in October 2004.

On November 17, 2003, plaintiff met with Foutch and, for the first time, discussed his voice problems with a representative of First National. During the November 17, 2003 meeting, plaintiff asked Foutch to place him into open positions that did not require communication over the telephone or in person with clients. First National, at plaintiff's request, extended the redeployment period to the end of December 2003 in light of plaintiff's scheduled appointments at the Mayo Clinic. Foutch

-13-

also reminded plaintiff that one of his benefits was long-term disability insurance, and that was an option he could pursue.

On December 23, 2003, plaintiff sent an e-mail to Mike Foutch advising that he would be receiving Botox treatments every three months for the rest of his life.  The message continued:

> I speak with Dr. Duffy weekly so he can evaluate my voice to aid in the treatment process.  At present my voice is breathy, hoarse and sometimes normal.  It still takes a lot of effort to effectively communicate.  I feel that I need a job that does not require the amount of communication with the public as my previous position but I feel I can still hold a position that requires some communication with the public and my co-workers.  Right now I am available to work.  However, if I talk for an extended amount of time my voice will become fatigued.
>
> When I talked to Kristina [Staebell] in October and gave her my resume I asked her what I needed to do next.  I was told there was nothing I could do that I needed to sit back and wait.  After waiting and not hearing anything from her for about a month, I went to the Beatrice Branch to pull up a list of internal openings.  At that time I was still unsure about the outcome of my treatment and my ability to communicate.  Up to this point it was difficult to focus on anything but my treatment.  Since my treatment I received the phone call about the interview with Barbara and I have no problem becoming more active in the job finding process but I feel that I have kept up communication with FNBO throughout this process and have made numerous trips to Omaha.

The message further advises that plaintiff would continue to view the current openings with First National; however, he was "uncomfortable" reviewing the openings at the Beatrice Branch "after the way [he had] been treated for the past several years."  Thus, he would have to go to Omaha to view the internal openings because they were not posted on the Career Link.  Finally, plaintiff stated he intended to put together a letter to the Personnel Committee, which he would have submitted several years ago if he had known the committee existed, as "no one should have to go through what I went through with management at the Beatrice Branch."

-14-

On December 23, 2003, plaintiff advised Kristina Staebell that his doctor told him he could not work in sales jobs. The next day, Staebell e-mailed plaintiff a list of job opportunities available with First National. On December 30, 2003, plaintiff told Staebell by telephone that he did not want to be considered for positions that paid an annual salary of less than $35,000.

Plaintiff applied for the following positions with defendant between December 24, 2003, and August 17, 2005:

| Job Title/Number | Date of Application | Resolution |
|---|---|---|
| Loan Operations Assistant (23-1510) | 12-24-2003 | Application withdrawn by plaintiff |
| Senior Service Representative (23-1506) | 12-24-2003 | Application withdrawn by plaintiff |
| Mail Production Specialist (23-1513) | 12-24-2003 | Application withdrawn by plaintiff; salary requirement not met |
| Consumer Loan Review Analyst (23-1497) | 12-29-2003 | Plaintiff not interviewed |
| Senior Administrative Assistant (23-1529) | 12-29-2003 | Application withdrawn by plaintiff |
| Private Banker (23-1293) | 01-14-2004 | Position voided/not filled |
| Associate Manager (24-0085) | 01-28-2004 | Interviewed; manager hired a more qualified candidate who had systems and area experience |
| Senior Personal Banker (24-0112) | 02-11-2004 | Not interviewed; sales job; salary requirement not met |
| Compliance Analyst (23-1430) | 02-26-2004 | Position voided/not filled |
| Staff Auditor/Finance (23-1477) | 03-09-2004 | Not interviewed; plaintiff did not meet job qualifications |
| Loan Documentation Specialist (24-0186) | 03-17-2004 | Not interviewed; salary requirement not met and plaintiff did not meet job qualifications |
| Management Trainee (24-0253) | 03-24-2004 | Not interviewed; plaintiff did not meet job qualifications |

-15-

| Job Title/Number | Date of Application | Resolution |
|---|---|---|
| Lending Account Representative (24-0474) | 06-17-2004 | Position voided/not filled |
| Business Systems Liaison 3 (24-0504) | 07-12-2004 | Not interviewed; plaintiff did not meet job qualifications |
| Commercial Credit Analyst (24-0581) | 07-29-2004 | Interviewed; manager hired a more qualified person who had a significant accounting background |
| Commercial Loan Officer (24-0588) | 07-29-2004 | Not interviewed; plaintiff did not meet minimum job qualifications |
| Senior Loan Operations Assistant (24-0591) | 07-29-2004 | Interviewed; manager hired a more qualified person who had more loan operations experience |
| Senior Credit Analyst (24-0711) | 09-09-2004 | Not interviewed; plaintiff did not meet minimum job qualifications |
| Mortgage Loan Originator (24-0769) | 10-07-2004 | Not interviewed; plaintiff did not meet minimum job qualifications |
| Assistant Bank Manager (24-0937) | 12-16-2004 | Not interviewed because job was sales related |
| Account Support Specialist III (25-0503) | 06-17-2005 | Not interviewed; manager hired more qualified person with back office and operational experience |
| Account Reconciliation Specialist (25-0533) | | Interviewed; manager hired more qualified person with back office and operational experience |
| Branch President (25-0354) | 08-17-2005 | Interviewed, but plaintiff did not meet minimum job qualifications regarding sales, community involvement and management experience |

On or about February 23, 2004, plaintiff applied for long term disability ("LTD") benefits

offered through Mutual of Omaha.  In an e-mail to Mike Foutch dated February 18, 2004, plaintiff

stated that his primary goal was to find employment with First National; however, he completed the

disability papers in order to take advantage of all options, given the uncertainty of his situation.  In

his application for LTD benefits, plaintiff stated that he is "unable to communicate at times."

-16-

On or about March 31, 2004, plaintiff was placed on LTD and received LTD benefits, retroactive to November 6, 2003.  Plaintiff's monthly LTD benefits payment in lieu of salary was set at $2,352.78 per month.  Between his notification of redeployment on September 30, 2003 and his receipt of LTD benefits, plaintiff received wages and benefits from defendant in amounts equal to those he received before redeployment.   In addition to the LTD payments, Mutual of Omaha paid for plaintiff to study for an associate's degree in science at Southeast Community College.  Plaintiff received in his associate's degree in September 2005.

Plaintiff has not been employed since his redeployment on September 30, 2003.  Plaintiff has submitted no applications for positions with First National since August 17, 2005.

Beginning in or about May 2004, Mutual of Omaha retained Jack Greene to assist plaintiff in finding a job that paid close to the base salary he earned at the Beatrice branch.

In June 2004, plaintiff underwent surgery on his vocal cords and has received ongoing treatment for his condition, but his speech is still impaired.

Plaintiff enrolled in a second associate's degree program in science (vascular technology) at Bryan College of Health Services beginning in May 2005.  In addition to the LTD payments and educational payments for the associate's degree plaintiff received in 2005, Mutual of Omaha paid for plaintiff's tuition, books, and transportation costs to study for the second associate's degree.

In addition to applying for and receiving LTD benefits and education assistance provided by Mutual of Omaha, plaintiff also applied for LTD benefits through the Social Security Administration, as required by the Mutual of Omaha disability policy.  His application for Social Security benefits was denied.

On June 28, 2004, plaintiff filed charges of discrimination with the Nebraska Equal Opportunity Commission ("NEOC") and the Equal Employment Opportunity Commission ("EEOC"), alleging disability discrimination due to (1) defendant's redeployment of plaintiff and failure to rehire plaintiff and (2) failure to accommodate plaintiff's disability by placing him in other positions.  During his deposition taken on June 27, 2006, plaintiff acknowledged he told the NEOC investigator that it was "virtually impossible" for him to talk to people over the telephone.

## III.  LAW

### A.  Jurisdiction

Defendant timely removed this action to federal court pursuant to 28 U.S.C. § 1446(b).  This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  Venue in this court is proper under 28 U.S.C. § 1391.

### B.  Standard of Review

Under Fed. R. Civ. P. 56, summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Harder v. ACandS*, 179 F.3d 609, 611 (8th Cir. 1999).  "In making this determination, the function of the court is not to weigh evidence and make credibility determinations, or to attempt to determine the truth of the matter, but is, rather, solely, to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  The court must "look to the substantive law to determine whether an element is essential to a case, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment.'" *Dulany v. Carnahan*, 132 F.3d 1234, 1237 (8th Cir. 1997) (quoting *Anderson*, 477 U.S. at 248).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact. *See Tenbarge v. Ames Taping Tool Sys., Inc.*, 128 F.3d 656, 657-58 (8th Cir. 1997); NECivR 56.1(a).

In the face of a properly supported motion, "[t]he burden then shifts to the nonmoving party to 'set forth specific facts showing that there is a genuine issue for trial.'" *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997), *cert. denied*, 522 U.S. 1048 (1998) (quoting Fed. R. Civ. P. 56(e)). A nonmoving party may not rest upon the mere allegations or denials of its pleadings, but rather, must set forth specific facts, supported by affidavits or other proper evidence, showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Liberty Mut. Ins. Co. v. FAG Bearings Corp.*, 153 F.3d 919, 922 (8th Cir. 1998). In this respect, the nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts;' ... [i]t must show there is sufficient evidence to support a jury verdict in [its] favor." *Chism v. W.R. Grace & Co.*, 158 F.3d 988, 990 (8th Cir. 1998); *see* NECivR 56.1(b).

### C. Americans With Disabilities Act ("ADA")

The ADA, 42 U.S.C. § 12112(a), provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

-19-

"Discrimination" includes an employer's failure to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer. *Dropinsky v. Douglas County*, 298 F.3d 704, 707 (8th Cir. 2002); 42 U.S.C. § 12112(b)(5)(A).

The plaintiff has not offered direct evidence of disability discrimination. His claims, therefore, are subject to the burden-shifting procedure set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., Gilbert v. Des Moines Area Cmty. Coll.*, — F.3d ——, Case No. 06-3021, 2007 WL 2254936 (8th Cir., Aug. 8, 2007).

To prove disability discrimination, the plaintiff "must establish that (1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation; and (3) he suffered an adverse employment action under circumstances that give rise to an inference of unlawful discrimination based on disability." *Dropinsky v. Douglas County*, 298 F.3d at 706; *see also Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1034 (8th Cir. 2005). The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C); *Breitkreutz v. Cambrex Charles City, Inc.*, 450 F.3d 780, 783 (8th Cir. 2006).

Once a plaintiff has proven a prima facie case, the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for the adverse employment action. If the employer does so, the burden shifts back to the employee to prove that the reason was pretextual. *Henderson v. Ford Motor Co.*, 403 F.3d at 1034.

-20-

### 1. Plaintiff's Burden - Prima Facie Case

#### a. "Disabled."

Remarkably, First National contends that the plaintiff was not disabled at the time he was redeployed.  The record shows that plaintiff began having difficulty talking some time in 1999 and his condition deteriorated over the years.  His condition was obvious, although he did not discuss it with his employer and the condition did not appear to impair plaintiff's ability to perform his job.  Bank managers and employees were aware of plaintiff's condition, and commented on it.  The fact that his condition was not diagnosed until November 7, 2003 by a specialist at the Mayo Clinic does not mean that plaintiff's speech impairment was not apparent or obvious six weeks earlier, at the time of redeployment.

Under the ADA, "major life activities" include functions such as "speaking." *See* 29 C.F.R. § 1630.2(i).  The court finds that plaintiff has met his burden of proving he had a physical impairment that substantially limited the major life activity of speaking.   42 U.S.C. § 12102(2)(A).

#### b. "Qualified."

The plaintiff must show that he is qualified to perform the essential functions of his job with or without reasonable accommodation.  Although the plaintiff bears the ultimate burden of proving that he is a qualified individual, an employer who disputes allegations that the plaintiff can perform the essential functions of the job must put forth evidence establishing those functions.  *Dropinsky v. Douglas County*, 298 F.3d at 707.  This evidence may include:

> (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs.

*Id.* (citing *Heaser v. The Toro Co.*, 247 F.3d 826, 831 (8th Cir. 2001). The court finds that the defendant has produced enough evidence to meet this burden.

Under the ADA,

The term "reasonable accommodation" ***may*** include–
    (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
    (B) job restructuring, part-time or modified work schedules, *reassignment to a vacant position*, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9) (emphasis added).

There is no precise test for what constitutes a reasonable accommodation, but a proposed accommodation is unreasonable if it "either imposed undue financial or administrative burdens, or requires a fundamental alteration in the nature of the program." *DeBord v. Board of Educ.*, 126 F.3d 1102, 1106 (8th Cir. 1997); *accord Walsted v. Woodbury County*, 113 F. Supp. 2d 1318, 1332 (N.D. Iowa 2000). "'While job restructuring is a possible accommodation under the ADA, this court has held that an employer need not reallocate or eliminate the essential functions of a job to accommodate a disabled employee.'" *Dropinsky v. Douglas County*, 298 F.3d at 709-10 (quoting *Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 950 (8th Cir. 1999)); *see also Treanor v. MCI Telecomm. Corp.*, 200 F.3d 570, 575 (8th Cir. 2000); *Moritz v. Frontier Airlines, Inc.*, 147 F.3d 784, 788 (8th Cir. 1998).

The court finds that plaintiff was qualified to perform the essential functions of the job of Consumer Bank Sales Representative at the time he was redeployed. To the extent plaintiff claims that First National failed to accommodate him in performing this job, "Generally, it is the

-22-

responsibility of the individual with the disability to inform the employer that an accommodation is needed." *Kratzer v. Collins*, 295 F. Supp. 2d 1005, 1013 (N.D. Iowa 2003). Plaintiff was well aware of First National's sales goals and there is no evidence that he requested any accommodation in achieving them.

In his Charge of Discrimination filed with the NEOC and EEOC, plaintiff stated that he believed First National was "obligated to place me into any open positions I am qualified for since eliminating my former position on 9/30/03, that would accommodate my disability[.]" He also stated that he made accommodation requests to Mike Foutch "for placement into open positions that do not require communication on the telephone or in person with clients as an essential function of the position[.]" The record shows, however, that plaintiff advised First National he did not want to be considered for positions that paid an annual salary of less than $35,000. This self-imposed restriction eliminated the consideration of many "accommodating" jobs otherwise available at First National and many of the positions for which plaintiff submitted applications.

Plaintiff also informed First National in December 2003 that he had a medical restriction: his doctor told him he could not work in sales jobs. Specifically, Dr. Duffy had concluded after his initial examination in November 2003 that plaintiff's "deficits [were] severe enough to preclude his being effective in any job requiring phone work or direct speaking contact with clients." As of April 25, 2005, Dr. Duffy was still of the opinion that plaintiff had "a problem that would be very significantly disabling for anyone engaged in work requiring speech and interpersonal communication" and that the problem "is sufficiently severe to impact [plaintiff's] ability to communicate effectively in any work setting requiring reasonably normal speech."

-23-

First National decided to interview plaintiff for five positions: Associate Manager (24-0085), Commercial Credit Analyst (24-0581), Senior Loan Operations Assistant (24-0591), Account Reconciliation Specialist (25-0533), and Branch President (25-0354). The court finds that plaintiff was in some sense qualified for these jobs, as First National was unlikely to interview candidates who were clearly unqualified, but plaintiff would have needed certain accommodations in light of his medical restrictions that he not perform any work requiring telephonic communication or direct speaking contact with clients. The accommodations suggested in plaintiff's brief are that he be allowed to use e-mail in lieu of telephone communications, or have other employees assist him with any telephone calls he might receive. The court finds that these proposed accommodations are not reasonable. These positions all involved customer service or managerial functions, and providing the requested accommodations would require a "fundamental alteration in the nature of the program." Since plaintiff could not perform any of these jobs without an accommodation, and because plaintiff's suggested accommodations are not reasonable, the court finds that plaintiff was ultimately not qualified for these jobs.

The court must also reject plaintiff's assertion that the ADA required First National, as an accommodation, to reassign him to a position meeting his salary requirement that did not require telephone work or direct speaking contact with clients. A similar issue was recently considered by the Eighth Circuit in *Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480 (8th Cir. 2007). Huber became disabled after she was injured at work. She sought, as a reasonable accommodation, reassignment to a vacant and equivalent position. Wal-Mart, however, refused to reassign Huber automatically to the position. Rather, pursuant to its policy of hiring the most qualified applicant for the position,

Wal-Mart required Huber to apply and compete for the router position with other applicants.  In this context, the Eighth Circuit held:

> the ADA is not an affirmative action statute and does not require an employer to reassign a qualified disabled employee to a vacant position when such a reassignment would violate a legitimate nondiscriminatory policy of the employer to hire the most qualified candidate. This conclusion is bolstered by the Supreme Court's decision in *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 406, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002), holding that an employer ordinarily is not required to give a disabled employee a higher seniority status to enable the disabled employee to retain his or her job when another qualified employee invokes an entitlement to that position conferred by the employer's seniority system. We previously have stated in dicta that "an employer is not required to make accommodations that would subvert other, more qualified applicants for the job." *Kellogg v. Union Pac. R.R. Co.*, 233 F.3d 1083, 1089 (8th Cir. 2000) (per curiam).

*Huber*, 486 F.3d at 483-84.

First National had a policy of providing equal employment opportunity for all employees and applicants for employment regardless of race, color, religion, creed, sex, marital status, age, national origin, veteran status or disability.  First National also had a policy of "redeploying" employees who might otherwise be terminated when their job positions were eliminated.  The redeployment policy required all redeployed persons to apply for open positions at First National if they wished to remain employed by First National.

In light of the recent decision in *Huber*, the court finds that First National had no duty to accommodate plaintiff by automatically awarding him a position for which he met the minimum requirements.  As to the positions for which plaintiff was actually interviewed, First National has provided evidence that other candidates were hired because First National determined they were more qualified for the jobs.  The plaintiff has not provided any actual evidence to the contrary, although he has explained why he disagrees with First National's hiring decisions.  In any event, the

ADA does not require First National to turn away superior applicants in order to award any particular position to the plaintiff, and it is the employer's role–not the court's role–to identify the strengths that constitute the best qualified applicant. *See Kincaid v. City of Omaha*, 378 F.3d 799, 805 (8th Cir. 2004).

### c. Adverse Employment Action

Finally, the plaintiff must show that he suffered an adverse employment action under circumstances that give rise to an inference of unlawful discrimination based on disability. The court finds that being redeployed and not being rehired constitute adverse employment actions; however, the record does not support the conclusion that these actions were made under circumstances that give rise to an inference of unlawful discrimination.

The course of events leading to the elimination of plaintiff's job with First National began in 2002, when First National began its campaign to improve the performance of its Beatrice branch by increasing lending activity and efficiency. All the employees of the Beatrice branch were required to make changes in order to generate more lending activity and operate more efficiently. When these objectives were not met, and the Beatrice branch remained unable to perform at the level desired by First National, management affirmed its initial impression that the branch was overstaffed and a position would have to be eliminated. After analyzing the functions of the various positions, the goals of the organization, and the employees' qualifications and performance histories, it was determined that plaintiff's position was expendable. Noting plaintiff's arguments to the contrary, the record does not support a finding that the decisions to increase plaintiff's sales quota and ultimately to place plaintiff in redeployment were in any way motivated by plaintiff's speech disability.

-26-

The court finds that plaintiff suffered adverse employment actions, but the actions were not made under circumstances that give rise to an inference of unlawful discrimination based on disability.

The plaintiff has not proven a prima facie case of discrimination.

### 2. Defendant's Burden

Even if plaintiff had met his burden to prove a prima facie case, the court finds the defendant has offered legitimate, nondiscriminatory reasons for the adverse employment actions. In this regard, "the employer must articulate, but need not prove, a legitimate, non-discriminatory reason for its employment decision." *Sanchez v. American Popcorn Co.*, 450 F. Supp. 2d 985, 1001 (N.D. Iowa 2006). "The employer's explanation of its actions must be 'clear and reasonably specific.'" *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 US. 248, 258 (1981)). "The employer 'need not persuade the court that its proffered reasons are legitimate; the defendant's burden is merely one of production, not proof.'" *Id.* (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004), *cert. denied*, 126 S. Ct. 478 (2005)).

In this case, First National has satisfactorily explained why the plaintiff's job was eliminated, causing him to be redeployed. First National has satisfactorily explained why plaintiff was not interviewed for certain positions and why he was not hired for the positions for which he was interviewed. First National has articulated legitimate, non-discriminatory reasons for all its employment decisions regarding the plaintiff.

### 3. Plaintiff's Burden – Pretext

Once again assuming that plaintiff has proven a prima facie case, and finding that the defendant has met its burden to articulate legitimate, non-discriminatory reasons for its actions, the

-27-

burden shifts back to the employee to prove that the reasons were pretextual. To prove pretext, the employee "must do more than show that the employment action was ill-advised or unwise, but rather must show that the employer has offered a 'phony excuse.'" *Henderson v. Ford Motor Co.*, 403 F.3d at 1026, 1034 (8th Cir. 2005).

To this end, plaintiff has offered an expert opinion that the economy in Beatrice was not in decline during the time in question. This information, however, does not tend to show that First National's stated business decision to redeploy the plaintiff was pretextual. Plaintiff's performance evaluations, before and after 1999, consistently noted that he needed to improve in areas of production with customers and cross-selling. The process leading to the deployment decision began in 2002, over 18 months before plaintiff was actually redeployed. Even if First National was wrong about the condition of the economy in general, and particularly in the Beatrice market, such an error does not support the assertion that its business decisions were intended, because of plaintiff's voice, to hinder the plaintiff's ability to perform his job.

## IV. CONCLUSION

"[T]he employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Kincaid v. City of Omaha*, 378 F.3d 799, 805 (8th Cir. 2004). In this case, the court finds that the plaintiff has not met his burden of proving a prima facie case of discrimination based on disability because the adverse decisions complained of were not made under circumstances that give rise to an inference of unlawful discrimination based on disability. Even assuming that plaintiff met his

burden of proof, the defendant articulated legitimate, non-discriminatory reasons for its employment decisions and the plaintiff cannot show those reasons were a pretext for unlawful discrimination.

Accordingly,

**IT IS ORDERED:**

1.  Defendant's Motion for Summary Judgment [60] is granted in its entirety.

2.  Pursuant to this Memorandum and Order, judgment will be entered in favor of the defendant and against the plaintiff.

**DATED September 19, 2007.**

                                        **BY THE COURT:**

                                        **s/ F.A. Gossett**
                                        **United States Magistrate Judge**